Dan SANBORN et al.

v.

R. H. PALM et al.

Civ. A. No. 70–L–47.

United States District Court,
S. D. Texas,
Laredo Division.

June 4, 1971.

[redacted]

[redacted]

[redacted]

Ewers, Toothaker, Ewers, Abbott, Evins & Talbot, O. C. Hamilton, Jr., McAllen, Tex., for plaintiffs.

Hall & Zaffirini, H. C. Hall, III, Laredo, Tex., and Mayfield, Broaddus & Perrenot, R. B. Perrenot, El Paso, Tex., for defendants.

CONNALLY, Chief Judge.

MEMORANDUM:

This action had its genesis in a three-pronged controversy between the parties for the alleged infringement of trademark and unfair competition in El Paso, Texas, in Laredo, Texas, and in the State of California. With jurisdiction vested under §§ 1121–1125 of Title 15 U.S.C.A., the plaintiffs sought injunctive relief and a declaratory judgment to establish the plaintiffs' right, exclusively as against the defendants, to the name "Sanborn" in the business of selling Mexico automobile insurance and travel service. An accounting, with money damages, also was sought.

Dan Sanborn, a resident of McAllen, Texas, and two corporations which he owns and controls, are the parties plaintiff. The defendants are a number of individuals, most of whom were formerly associated together in the Belk Insurance Agency. Throughout the trial all the defendants were known as the "Belk group" or "Belk interests". Recently R. H. Palm, one of such defendants, has succeeded to the interests of the others, and hence the defendants collectively will be referred to as "Palm" or as "Belk".

These issues encompassed in the main action were fully tried, to the Court without a jury, February 24–26, 1971. Thereafter the Court announced its findings to the effect that the defendants had deliberately undertaken to misappropriate the trade name, trademarks, and good will of the plaintiff Sanborn. Injunctive relief was granted restraining the defendants from further use of the name in connection with its El Paso operations. Action was withheld with respect to the defendants' operations in California, by reason of the fact that the plaintiff previously had initiated and brought to trial a state court action (also resulting in injunctive relief in his favor) against the defendants in a California court, which action was then on appeal. In deference to the state court's priority of jurisdiction, action was withheld. Action was likewise withheld with respect to the Laredo controversy as will appear hereafter.

Following the announcements of the findings and conclusions, the parties entered into settlement negotiations which culminated in an agreement under which the defendants abandoned further right to use the Sanborn name, trademarks, etc. in their El Paso operations and in the State of California. The plaintiff repurchased two insurance agencies in

Laredo, Texas, including the use of his name in connection therewith. As result of this agreement, there presently remains for determination only a cross-action filed by the defendants. They allege that by reason of the terms of, and operation under, the two contracts of February 29, 1968, plaintiff committed a violation of the Sherman Act, 15 U.S.C.A. § 1, for which they seek to recover an exceedingly large amount as damages, attorneys' fees, etc.

To bring this controversy into proper context, the following statement of the background is required.

As every traveler by automobile to our sister republic to the south is aware —or learns at his peril—public liability insurance is a matter of necessity while traveling by automobile in Mexico. The rates are high by American standards, and are fixed by Mexican law. Such coverage usually is sold for the duration of a trip, frequently a matter of one to three weeks. In recent years it has become a flourishing business in the American ports of entry and in the cities in proximity to the Mexican border.

The plaintiff Sanborn was referred to by one of the defendants in his testimony as the father of the Mexico insurance business. Whether this be entirely accurate, certainly he was one of the pioneers. In 1951 Sanborn established a local insurance agency for writing such insurance at McAllen, Texas, using the name "Sanborn's". The travel agency business—that is, the securing of reservations for travelers, dissemination of advice, the promotion of tours, etc.—was found to be closely connected with the sale of such insurance, and the plaintiff Sanborn conducted the two businesses jointly. Within a few years he established similar businesses in a number of other border towns. Sometime thereafter the two corporate plaintiffs were chartered under Texas law as will appear hereafter.

In its early days Sanborn was not particularly successful. As—in the eyes of the tourist—all Mexican insurance was the same, and the premiums therefor were identical, Sanborn undertook to devise a means of attracting the tourist to his place of business rather than that of his competitors. For this purpose he devised the Sanborn road log, and I find that this marked the beginning and was the primary cause of his ultimate success. This log was no mere road map such as is distributed to its customers by most major oil companies, nor was it simply an atlas such as is available through automobile associations, etc. For the preparation of his logs, Sanborn first cataloged all of the major highways— and later the byways as well—of Mexico. The trip between each city was described in meticulous detail on looseleaf sheets. Not only did the log indicate the route to be followed, the leading hotels, motels and restaurants, but gave a current mile by mile account of what the traveler should expect, such as highway construction, bad roads, sharp turns, etc. It was prepared in a humorous and appealing manner, and was safety oriented—not unusual in light of the fact that the issuer was in the insurance business. Thus when a traveler sought advice through the travel agency, and purchased his insurance through Sanborn's agency, he was provided free of charge with a tailor-made log of his trip from the various looseleaf sheets. These were attractively bound in a folder, with valuable tips for the traveler (such as what to do if subject to certain intestinal disorders which are not uncommon south of the border). Additionally, Sanborn advertised widely, both on a local and a national level, using certain distinctive pictures or insignia throughout. As result, he built up much good will and a valuable public image for "Sanborn's" travel agency and insurance service.

As his business expanded, Sanborn secured a general agency contract with Seguras la Commercial, one of a number of Mexican insurance companies. This contract was in essentially the form of general agency contracts in the insurance business in the United States. Under terms thereof, he was authorized to designate and appoint local agencies

to issue policies of insurance. As general agent he furnished such local agencies with the printed policy forms, which they were authorized to validate and sell to the traveling public. He guaranteed to the insurance company the accounts of all of his local agents. He kept the accounts between the local agents and his general agency, and between the general agency and the company. He was authorized to adjust and settle claims on behalf of and in the name of the company. While serving as general agent, Sanborn continued to own a number of the local agencies, and likewise designated others as local agents. His agreement with such local agents was oral (at least until the trial of this action) and was simply to this effect. The local agents were authorized to use the name "Sanborn" and thus to assure themselves of the benefits of the good will and the advertising which the name provided. They were provided the Sanborn road logs free of charge. They received their blank policies which they sold to the public, placing this coverage, of course, with Sanborn as general agent. The commission (as fixed by law at all times relevant hereto, though recently changed) was 40% of the premium collected, with 25% going to the local agent selling the insurance, and the remaining 15% retained by the general agent for his services.

This chain of agencies afforded its customers a further advantage in addition to the road logs, advice, etc. This had to do with the refund of unearned insurance premiums. If, for example, a traveler entered the Republic of Mexico through the port of Brownsville, Texas, and purchased insurance for three weeks, he might return through the port of Laredo, Texas, at the end of two weeks and thus be entitled to a refund of one week's unearned premium. In this event he was able to stop at the Sanborn office in Laredo and secure a cash refund. Obviously, if the agency through which he purchased originally maintained an office only in Brownsville, to secure a refund he likely would be subjected to trouble and delay.

By reason of the foregoing, prior to the time this controversy arose Sanborn and his two corporations had achieved a well recognized and highly respected place in the business of the sale of Mexico insurance and the related travel agency business. Sanborn agencies were in operation at the major ports along the Mexican border. The Sanborn logs, the pictures and other "sales gimmicks" which he employed had found great favor. He enjoyed a large repeat-business, and his satisfied customers passed the word to their friends. This situation continued until about mid-1968, by which time I am convinced that the Belk interests had determined to acquire the Sanborn name, good will, and public image by fair means if possible, and, if not, by foul.

In 1961 Sanborn appointed one A. M. Krohn as a local agent in El Paso, Texas, under an oral arrangement as described above. In October, 1967, Krohn sold the El Paso agency to the Belk interests, at that time an insurance agency in El Paso completely apart from and unconnected with Sanborn. This was with Sanborn's knowledge and consent, and Belk continued to operate as a Sanborn agent under the same arrangement as other local agents, and did so until the fall of 1970.

Shortly after the acquisition of the El Paso agency in 1967, Belk entered into negotiations with Sanborn for the purchase of the two local agencies in Laredo, Texas, owned by Sanborn. These negotiations culminated in the execution of the two contracts of February 29, 1968, which are here in controversy. They are in evidence, and I refer to them for specificity. Separate in form, in that one is between Sanborn individually and the Belk interests, and the second between Sanborn & Company (a Texas corporation) and the Belk interests, nevertheless they were intended as parts of a single transaction. In brief, under the first contract Sanborn sold the two

Laredo agencies, including the furniture, fixtures, and office equipment used therein, to Belk; and granted Belk the exclusive right in Webb County (Laredo) to use the name "Sanborn". Sanborn agreed not to compete with Belk in the Mexican automobile insurance business, in Webb County, Texas, for a period of five years. Belk took an option to purchase Sanborn's travel agency, for a six-month period, for a relatively nominal consideration. Belk agreed to operate the business "on the same high plane" as it had been operated by Sanborn. The consideration moving from Belk to Sanborn was approximately $100,000.

Under the second contract, Sanborn & Company (the general agent of Seguras la Commercial) agreed to furnish the Sanborn road logs free of charge, for distribution by Belk to its customers. Belk agreed to place with Sanborn's general agency, and Sanborn agreed to accept all Mexican automobile insurance written by Belk at the standard 25% commission. The contract was for a term of five years, terminable at the option of either party after three years.

While the parties were negotiating for purchase by the defendants of the El Paso and the Laredo local agencies, they also were in negotiation relative to the purchase by the defendants of "Sanborn & Company", the general agency. After protracted negotiations, Sanborn elected not to sell, and terminated the matter about October, 1970. During all of this interval of negotiation, the defendants had been laying plans, against this eventuality, to misappropriate the Sanborn name.[1]

Palm, by now the active party in the Belk group, learned of a minor misunderstanding between Sanborn and Seguras la Commercial. He approached that company concerning their execution in his favor of a general agency agreement. These plans bore fruit, and at the request of an officer of Seguras, Sanborn met with him in El Paso on April 15, 1970. Palm also appeared at the meeting. These two, with an "I want to be the first to tell you" approach, advised Sanborn that Seguras was to give a general agency contract to Palm, and that the latter expected to go into competition with Sanborn. While, of course, these parties were entitled to do this, no doubt Sanborn felt that this was a defection on the part of his two old business associates.

While the prior arrangements continued for a short period, Sanborn soon advised Palm that as of a given date he should cease use of the Sanborn name, Sanborn would no longer write his insurance as a general agent, and that he would pick up his supplies, etc. Palm replied that he expected to continue use of the Sanborn name, and made claim

---

I. Among other evidence to this effect, the following is noteworthy. Without the knowledge or consent of Sanborn, the defendants had filed in several Texas counties under the assumed name records their claim to the name "Sanborn's". Likewise without the knowledge or consent of Sanborn, and for the same purpose, they had sought to do the same thing with respect to the entire State of California. Finding no assumed name statute in that state, they had chartered a corporation, "Sanborn Mexico Insurance". No stock was ever issued in this corporation, it was not active, and its sole purpose was the attempt to pre-empt the name. This led to the California state litigation. Additionally, defendants' conduct with respect to the Pottinger-Belk agreement is worthy of note. This agreement between the named parties with reference to their joint operations in connection with certain local Sanborn agencies actually agreed to nothing. However, Belk was anxious that Sanborn sanction the agreement and he, in writing, recognized Belk's right to the name "Sanborn" in certain specified areas. As this would appear to have been a gratuitous action on Sanborn's part, Belk suggested, without any solicitation whatsoever from Sanborn, that Belk give Sanborn a "release" of Belk's cause of action against him for breach of contract to sell "Sanborn & Company". Of course, there had been no contract to sell, and no breach thereof, and the only purpose of such a release could have been to serve as a consideration, moving from Belk to Sanborn, in connection with his approval of the Pottinger agreement.

thereto. This precipitated the filing of this action by Sanborn to recover use of his name in connection with the El Paso operations. As stated, the entire controversy was settled among the parties after the Court's decision in favor of the plaintiffs was announced, leaving unresolved the contention of the antitrust violation with respect to the Laredo agency during the interval of Palm's operation.

██ Belk contends that in construing the two contracts of February 29, 1968, together, a "tying agreement" [2] in violation of § 1 of the Sherman Act is made out. Belk argues that the "tying" product which Sanborn sold (and which Belk was anxious to acquire) was the Sanborn name; and the "tied" product (which Belk did not wish to buy) was the requirement that the insurance be placed with Sanborn & Company as general agent. The principal cases discussing the question, relatively few in number, are set out in the footnote.[3] As these authorities hold, where such a violation is made out, it is condemned as a means of suppressing competition and fixing prices.

While as noted briefly hereafter I am of the view that, when properly construed, no such violation is made out, this question is rendered moot by the fact that this action, dealing with an alleged Sherman Act violation in the insurance business, is removed from this court's jurisdiction by the terms of the McCarren Act (Title 15 U.S.C.A. §§ 1011–1015).

██ Prior to the decision by the United States Supreme Court in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), it was not considered that the business of insurance comprised interstate commerce. Thus the regulation and taxation of the insurance business was subject to state statutory control. *South-Eastern Underwriters* held, however, that interstate insurance business constituted interstate commerce and was subject to control by the Sherman Antitrust Act. This result placed in question the validity of the various state statutes taxing and regulating the insurance business. It was in light of this confused situation that the McCarren Act was passed.[4] The pur-

---

2. Such has been defined by the Supreme Court as ". . . an agreement by a party to sell one product but only on the condition that buyer purchases a different [tied] product, or at least agrees that he will not purchase that product from any other supplier." Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

3. International Business Machines v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Hanover Shoe Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Susser v. Carvel Corp., 332 F.2d 505 (2nd

Cir. 1964), cert. dism. 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Advance Business Systems and Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 (N.D.Calif.1970), presently on appeal to 9th Cir.

4. It reads in pertinent part in § 1012(b) as follows: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, *shall be applicable to the business of insurance to the extent that such business is not regulated by State law.*" (Emphasis added.)

228

pose and effect of this statute was to retain controls under the federal antitrust statutes in those areas of the insurance business not regulated by state law.[5] The statute has been repeatedly so construed. See: Allstate Insurance Co. v. Lanier, 242 F.Supp. 73 (E.D.N.C. 1965), aff'd 361 F.2d 870 (4th Cir. 1966), cert. den. 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212 (1966); Transnational Insurance Co. v. Rosenlund, 261 F.Supp. 12 (D.C.Or.1966); California League of Independent Insurance Producers v. Aetna Casualty and Surety Co., 175 F.Supp. 857 (N.D.Cal.1959); Professional and Business Men's Life Ins. Co. v. Bankers Life Co., 163 F.Supp. 274 (D.C.Mont.1958); United States v. Chicago Title and Trust Co., 242 F.Supp. 56 (N.D.Ill.1965).

■ Thus, if the Texas antitrust statutes cover the violation alleged in this case, this court would be deprived of Sherman Act jurisdiction. The pertinent Texas statutes are Texas Business and Commercial Code §§ 15.02 and 15.04 (a), 1968, V.T.C.A. The statutes are in broad and sweeping terms and read in pertinent part as follows:

Tex.Bus. and Com.Code Ann. § 15.02 (1968) provides in pertinent part:

"(b) A 'trust' is a combination of capital, skill, or acts by two or more persons to . . . (2) fix, maintain, increase, or reduce the price of tangible personal property, the cost of insurance, . . . . (3) prevent or lessen competition in . . . (B) the business of insurance; . ."

Tex.Bus. and Com.Code Ann. § 15.04 (a) (1968) states:

"(a) Every monopoly, trust, and conspiracy in restraint of trade as defined in Sections 15.01, 15.02, and 15.03 of this code, respectively, is illegal and prohibited."

If there was a violation of the type alleged by Belk, there can be no doubt that same is covered under the terms of the Texas statutes. Hence this court is without jurisdiction.

When the contracts are examined realistically and construed together (as I feel that they should be), I am of the view that there was no illegal tying agreement. What Sanborn sold was the proprietary interest in the two local agencies; and what he leased or franchised for a period of years was the good will package—name, free road logs, and covenant not to compete.

■ If it is considered that the local agencies which were sold constituted the "tying product", then clearly there was no violation. With respect to the business of sale of insurance at the local level, Sanborn had no dominant or controlling economic position, no leverage, in that field. Belk could have opened a competing agency simply by renting an office and hiring a clerk as dozens of others were doing in Laredo and as hundreds were doing in the other border cities, dealing in various types of insurance through various general agencies. This simply does not meet the test.

If the good will package be considered the "tying product", the situation is somewhat different, for obviously Sanborn had complete control of his name and the distribution of his logs. But when authorizing others to use his name and good will, Sanborn was entitled under the cases to some "quality control" to assure that same were not abused. The fact that Sanborn logs were available, and that this was known to the customers, was the key to the entire transaction. It was what Belk wanted and had been trying to acquire by various means for an extended period. But these logs were furnished free by Sanborn to his agents. His only compensation was through the 15% commission. As this was fixed by Mexican law and not subject to negotiation between the parties, the arrangement to place the insurance with Sanborn could not have had an effect on

---

5. An excellent discussion of the history of the Act is found in Allstate Insurance Co. v. Lanier, 242 F.Supp. 73 (E. D.N.C.1965), aff'd 361 F.2d 870 (4th Cir. 1966), cert. den. 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212 (1966).

the price. Thus, if by rather tortured construction this be considered a tying arrangement, the vices at which the statute are aimed are not present. It is supported by legitimate business considerations. See Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); Susser v. Carvel, supra; Siegel v. Chicken Delight, Inc., supra.

As the antitrust action will not lie in this court, the cross-action is dismissed.

The foregoing is adopted as Findings of Fact and Conclusions of Law.