William **STEINGART** et al., Plaintiffs,

v.

The **EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES** et al., Defendants.

No. 72 Civ. 4271.

United States District Court, S. D. New York.

Nov. 21, 1973.

Robert Howard, New York City, for plaintiffs.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant The Equitable Life Assur. Society of the United States; Sheldon Oliensis, Rene H. Reixach, Jr., New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Metropolitan Life Ins. Co.; Jay H. Topkis, Cameron Clark, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant The John Hancock Mut. Life Ins. Co.; William P. Hindman, Jr., New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant The Prudential Ins. Co. of America; James V. Hayes, New York City, of counsel.

METZNER, District Judge.

Defendants have moved pursuant to Fed.R.Civ.P. 12b(1) and (6) for an order dismissing the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

This is a double class action for alleged violations of the federal antitrust laws. Although not stated, jurisdiction is apparently predicated upon 28 U.S.C. § 1337. Plaintiffs purport to bring this action on behalf of "all owners of participating life insurance policies issued by mutual life insurance companies." The four named defendants have been sued as representitives of the class of "all mutual life insurance companies doing business within the United States."

The complaint alleges that the defendants have acted, and are continuing to act, in concert to "base life insurance costs on uniformly fictitious factors and procedures in order to eliminate competition and to fix unreasonably inflated market prices for life insurance coverage." The only other substantive allegations in the complaint are found in paragraphs 15–18 where it is claimed that the defendants (1) have conspired to "have set up arbitrary and unreasonable accounting practices," and to use "outdated and inapplicable mortality tables, yield assumptions and experience factors," and (2) are "inflating the cost of plaintiffs' life insurance by unreasonably diverting excessive amounts of money to reserve funds, unassigned surpluses, and executive benefit programs, in addition to funnelling vast sums of money into areas completely unrelated to life insurance." Finally, it is alleged that the defendants' officers and directors are "not fulfilling the proper obligations of their offices," and have "arranged to perpetuate themselves in power as the controllers of their respective companies, ignoring and obliterating every semblance of corporate democracy."

Plaintiffs seek an order directing the defendants to cease and desist from "violating the Federal antitrust laws," and from using reserve funds for "ventures unrelated to the life insurance business." In addition, plaintiffs ask for an order requiring the defendants (1) to "correct their accounting procedures," (2) to create procedures to assure plaintiffs "their rightful participation in the management and affairs of the respective companies," and (3) to "disgorge to plaintiffs, as dividends rightfully due to them and as their interests may appear, the vast excessive sums now being held improperly in reserve, surplus, and/or other accounts."

Defendants rely on the provisions of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015 (hereinafter referred to as McCarran Act), to sustain their motion. Section 1012 thereof provides, in pertinent part:

"(a) The business of insurance, and every person engaged therein, shall be

subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . .: *Provided, That after June 30, 1948, . . . the Sherman Act, and . . . the Clayton Act, . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law.*" (Emphasis added)

The McCarran Act was spawned by the Supreme Court's decision in United States v. South-Eastern Underwriters Assn., 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440 (1944), which held for the first time that insurance transactions were interstate commerce subject to the federal antitrust laws. Congress declared in the preamble to the Act that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011.

Since the alleged antitrust violations in the instant complaint involve the "relationship between the insurance company and the policyholder," it is clear that we are dealing here with the "business of insurance." Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The only question is whether this "business of insurance" is "regulated" by state law so as to displace the federal antitrust laws.

Defendants argue that inasmuch as the three named plaintiffs are all residents of New York, that state's laws are applicable to each of the defendants, even those incorporated elsewhere.

In order to overcome the applicability of the McCarran Act, however, plaintiffs argue that "where the price-fixing conspiracy is nationwide in scope and where the plaintiff policyholders [those whom plaintiffs seek to represent] who are resident in all fifty of the states are

having relationships with their own particular companies in certain states directly affected by the conspiratorial actions of insurers in other states, the McCarran Act exemption cannot be available." To support this position, plaintiffs rely on the Supreme Court's decision in Federal Trade Commission v. Travelers Health Association, 362 U.S. 293, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960). This case, rather than being supportive of plaintiffs' position, is authority for granting defendants' motion.

The decision does not render the McCarran Act inapplicable to the present lawsuit. In *Travelers Health,* the Court was faced with the question of whether an insurance company's mail order business was regulated by state law "so as to insulate its practices in commerce from the regulative authority of the Federal Trade Commission." *Id.* at 295, 80 S.Ct. at 718. The insurance company there was a Nebraska corporation which was licensed to do business only in Nebraska and Virginia. However, from its Nebraska offices, it conducted a mail order business with residents of every other state. The FTC sought to enjoin certain advertising practices of the company which it felt were deceptive. The company objected on the ground that such regulation was inapplicable by virtue of the McCarran Act inasmuch as Nebraska had legislation which prohibited deceptive advertising by its domiciliaries, not only in Nebraska, but also in any other state. In holding the McCarran Act inapplicable, the Court observed that "the state regulation which Congress provided should operate to displace this federal law means regulation by the State in which the deception is practiced and has its impact," and not regulation of a domiciliary state which purports to have extraterritorial effect (at 299, 80 S.Ct. at 720). The case was then remanded to the Eighth Circuit for a determination as to whether the various states into which the insurance company sent its policies "regulated" the alleged misconduct, so as to bring the McCarran Act into play.

■ It is unnecessary to inquire into the regulatory schemes of the fifty states in the instant case since we are dealing with a private antitrust suit, not an action instituted by the federal government in its regulative or enforcement capacity, such as occurred in *Travelers Health*. A government action under the antitrust laws is manifestly different in scope and purpose than a private suit. "The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served." United States v. Borden, 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). A private suit is predicated upon the plaintiff having been "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15.

■■ The scope of inquiry to determine whether the McCarran Act is applicable in a private action is thus limited to matters directly affecting the complaining parties. The three named plaintiffs here are all New York residents. In order for them to press a class action on behalf of all other policyholders similarly situated, they must first demonstrate that they have federal claims of their own which would be cognizable in this court. *Cf.* Rosario v. Rockefeller, 410 U.S. 752, 761 n. 9, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); Washington v. Wyman, 54 F.R.D. 266, 272 (S.D.N.Y.1971). This they fail to do.

■ It is clear that if the illegal conspiracy to fix prices alleged herein had operated solely within New York, New York would be the relevant state of "impact" of the alleged injurious conduct (*see Travelers Health, supra,* 362 U.S. at 298, 80 S.Ct. 717).

Obviously, New York has the power to employ a regulatory scheme to govern any such injury-producing conduct in order to protect its own citizens. This does not constitute any extraterritorial regulation by New York of insurance company activities in another state which might render the McCarran Act inapplicable. As far as these named plaintiffs are concerned, New York is the state where the improper conduct "[was] practiced and [had] its impact." *Travelers Health, supra* at 299, 80 S.Ct. at 721. Unlike *Travelers Health,* "the state regulation relied on to displace" the antitrust laws in this case *is* the "protective legislation" of the state, *i. e.,* New York, "whose citizens are the targets" of the conspiracy "in question." *Id.* 297, 80 S.Ct. at 720.

Since the named plaintiffs do not possess viable antitrust claims, it follows that they cannot represent a class of policyholders who are nonresidents of New York and as to whom the regulatory commands of New York do not inure.

New York has enacted not only a pervasive scheme of regulation and supervision of insurance, but has also adopted its own antitrust law which proscribes the very conduct alleged in the complaint. The Donnelly Act (N.Y.Gen. Bus.Law § 340 (McKinney's Consol. Laws, c. 20, 1968)) declares that every contract, agreement or conspiracy, whereby a monopoly is or may be established, is "against public policy, illegal and void." This Act is "almost a copy of section 1 of the Sherman Act" and "represents an equally strong public policy in favor of free competition for New York." Aimcee Wholesale Corp. v. Tomar Products, Inc., 21 N.Y.2d 621, 625, 289 N.Y.S.2d 968, 970, 237 N.E.2d 223, 224 (1968). More importantly, for the purposes of the instant case, the Donnelly Act was amended in 1948 and specifically made applicable to "licensed insurers . . . and other persons and organizations subject to the provisions of the insurance law." Section 340(2) N.Y.Gen.Bus.Law (McKinney 1968). This amendment was deemed desirable after the McCarran Act was passed so that New York could "accept Congress' invitation to regulate the insurance business." N.Y.Legis.Doc. (1948) No. 46 at 36.

It is clear that under the provisions of the Donnelly Act, as it applies to the business of insurance, New York has sought to regulate the very conspiratorial conduct alleged in this complaint. See also N.Y.Ins. Law §§ 67, 175–179–a (McKinney's Consol.Laws, c. 28, 1973). On this basis alone, the McCarran exemption should operate as a bar to plaintiffs' federal antitrust claims.

State regulation of the "business of insurance" under Section 1012 exists "when a State statute generally proscribes . . . or permits or authorizes certain conduct on the part of the insurance companies." California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., 175 F.Supp. 857, 860 (N.D.Cal.1959); accord, Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178, 1181 (7th Cir. 1971), cert. denied, 409 U.S. 917, 93 S. Ct. 215, 34 L.Ed.2d 180 (1972). With this standard in mind, we turn to the various allegations in the complaint.

As far as the plaintiffs' claim that the defendants are using arbitrary and unreasonable accounting practices is concerned, it is clear that New York has undertaken to extensively regulate this facet of the business of insurance. Section 217 of the New York Insurance Law (McKinney 1973) provides that annual statements of insurance companies must follow the form prescribed by the National Association of Insurance Commissioners and must include inter alia: (1) the annual dividend rates and the precise method of their calculation; (2) total expenses and expense limits figured in a specific manner; and (3) gains and losses on all business transactions and the sources thereof. In addition, the State Superintendent of Insurance has enacted administrative regulations which prescribe the standards for valuing all kinds of insurance investments (11 N.Y.C.R.R. § 75.1 et seq.), as well as the methods to be used in reporting income and expenses (11 N.Y.C. R.R. § 90.1 et seq.). See also N.Y.Ins. Law § 189 (McKinney 1966).

As far as the plaintiffs' claim that out-of-date mortality tables and inapplicable yield assumptions are being used by the defendants, this, too, is regulated by the state. Section 73 of the Insurance Law provides that:

"Every [life] insurer . . . shall, . . . maintain reserves . . . computed according to the tables of mortality and rates of interest prescribed in this chapter."

Section 205 sets out the mortality tables and interest rates to be used. In addition, several other sections of the Insurance Law relate to the use of mortality tables and the Superintendent's control of the tables which are in fact used. See, e. g., Sections 208, 208–a, subd. 1(e), 213(10), N.Y.Ins.Law (McKinney 1973).

The subject of the excessive monies which plaintiffs claim are being diverted to "reserve funds, unassigned surpluses and executive benefit programs," is also dealt with completely by the state in Sections 73, 74, 205, 207, 214 and 216, N.Y.Ins.Law (McKinney 1973).

Similarly, the accusation that defendants have been "funnelling vast sums of money into areas completely unrelated to life insurance" is also monitored by the state. Section 46–a, Subd. 1(k) of the Insurance Law specifically restricts investments in, or acquisitions of, subsidiaries to enterprises whose activities are "reasonably ancillary to an insurance business." In addition, Sections 78 through 91, N.Y.Ins.Law (McKinney 1973), prescribe the nature of other types of investments which are authorized.

Plaintiffs' complaint that the defendants' officers have perpetuated themselves in control of their companies in contravention of corporate democracy is also covered by state regulation in Section 198 of the Insurance Law.

Finally we note that under the applicable New York law, foreign insurance companies transacting business in New York, such as defendants Prudential and John Hancock, with home offices in New Jersey and Massachusetts respectively,

must be licensed in order to do business in the state (Section 40, N.Y.Ins.Law (McKinney 1966)), and must "comply substantially with any requirement or limitation of this chapter, applicable to similar domestic insurers . . . ." (Section 42(5), N.Y.Ins.Law (McKinney 1973)).

It is, therefore, clear from the above that the New York statutory scheme "regulates" the business of insurance in the areas complained of by the complaint, and the McCarran exemption is applicable. Furthermore, the courts have held that it is the existence of the regulatory scheme which is decisive, not the efficacy or wisdom of the enactments (Travelers Insurance Co. v. Blue Cross of Western Pa., 481 F.2d 80 (3d Cir.), cert. denied, 42 U.S.L.W. 3348 (Dec. 10, 1973); Commander Leasing Co. v. Transamerica Title Insur. Co., 477 F. 2d 77, 84 (10th Cir. 1973); Ohio AFL–CIO v. Insurance Rating Board, *supra*), provided that the regulation is not "mere pretense." Federal Trade Commission v. National Casualty Co., 357 U.S. 560, 564, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958).

Since New York's regulation of this conduct operates to supplant the federal antitrust laws, these plaintiffs have failed to state a claim upon which relief may be granted. *Cf.*, Trans World Airlines, Inc. v. Hughes, 359 F.Supp. 783, 785 (S.D.N.Y.1973).

Despite the foregoing, we note that plaintiffs have suggested for the first time in their answering papers to this motion that the alleged conspiracy may be subject to federal antitrust jurisdiction under the McCarran Act because it is "effectuated by boycott, coercion, or intimidation."

The McCarran Act specifically provides that:

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." (15 U.S.C. § 1013(b))

Plaintiffs urge that the instant complaint "*could* be amended in conformity" (emphasis supplied) with the allegation of boycott which has been presented in their answering papers. However, no such motion has been made, and the court will not entertain such afterthought. It is readily apparent that the above suggested course of action is being offered as a last ditch effort to revive an otherwise moribund complaint. Nowhere in the complaint is there the barest hint of any facts which would support the notion of boycott or coercion.

The complaint is dismissed for failure to state a claim.

So ordered.