Marcel and Muriel **MEICLER**, Plaintiffs,

v.

**AETNA CASUALTY AND SURETY COMPANY et al., Defendants.**

Civ. A. No. 73–H–515.

United States District Court,
S. D. Texas,
Houston Division.

March 12, 1974.

---

Jamail & Gano (Joseph D. Jamail, Don M. Barnett and Robert F. Stein Jr.), Houston, Tex., for plaintiffs.

Talbert, Giessel & Stone (Henry P. Giessel), Houston, Tex., Thompson, Coe, Cousins Irons & Porter (David B. Irons and R. B. Cousins), Dallas, Tex., Vinson, Elkins, Searls, Connally & Smith (Harry M. Reasoner and David T. Harvin), Kenneth J. Will, Fulbright, Crooker & Jaworski (Thomas R. McDade, B. J. Bradshaw and Richard N. Carrell), Butler, Binion, Rice, Cook & Knapp (Garey B. Spradley and Frank J. Knapp), Baker & Botts (Finis E. Cowan, Philip J. John, Jr., David P. Cotellesse, Michael Y. Saunders), Houston, Tex., Sewell, Junell & Riggs, Houston, Tex., Clark, Thomas, Denius, Winters & Shapiro (Barry K. Bishop), Austin, Tex., for defendants.

## MEMORANDUM AND ORDER

SEALS, District Judge.

The instant suit was filed as a class action by the named Plaintiffs, Marcel and Muriel Meicler, on behalf of themselves and all persons, firms, partnerships, associations and corporations, similarly situated, which are or have been automobile liability insurance policyholders within the State of Texas since August 1, 1967. Plaintiffs' First Amended Original Class Action Complaint names one hundred and seven insurance companies which are authorized to sell automobile liability insurance in this State as Defendants.[1]

It appears that Plaintiffs were owners, as of some unspecified date subsequent to August 1, 1967, of an automobile liability insurance policy issued by one of these Defendants. Upon the ex-

---

1. Two of the original Defendants, Dairyland Insurance Company and Farmers and Merchants Insurance Company, were dismissed pursuant to agreed Motions to Dismiss.

piration of the policy Plaintiffs were informed by the issuing company that they had been placed in a less favorable risk classification. They were further told that the policy would be renewed· for the same amount of coverage only if they paid the higher premium rate required by the new classification.

Plaintiffs attempted to purchase insurance from several of the other Defendants under their old classification and premium rate, but found that a policy could not be obtained except under the terms of the new less favorable classification. The Complaint states in pertinent part:

> "Such concerted action in re-classifying Plaintiffs and all those similarly situated and concerted refusal by the Defendants to deal with the Plaintiffs and all others (sic) similarly situated amounts to and is a boycott by these Defendants. It is the result of a continuing agreement, understanding and concert of action among the Defendants to unreasonably restrain trade and commerce. Such action on the part of the Defendants has denied Plaintiffs and all others similarly situated the opportunity to purchase automobile liability insurance without the assessment of automatic penalties and increased costs for such insurance."

Two separate causes of action are set forth. First, it is contended that Defendants have violated and are violating the antitrust laws of the United States, Title 15, U.S.C. § 1 et seq., specifically, but not limited to, violations of Sections 1 and 13 thereof. Second, Plaintiffs urge that by virtue of Defendants' arbitrary and capricious actions, they are being ". . . denied equal protection and deprived of their property without due process of law."

## I. ANTITRUST ALLEGATIONS

█ In response to Plaintiffs' antitrust claims, Defendants filed a motion to dismiss for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted. The motion is predicated upon the Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) "state action" doctrine and the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. Briefly, Parker v. Brown and its progeny stand for the proposition that the Sherman Act is inapplicable where a restraint upon trade or monopoly is the result of valid governmental action. Since this Court is of the opinion that Defendants' motion to dismiss is clearly sustainable under the McCarran-Ferguson Act, it will not be necessary to determine the applicability of Parker v. Brown to this litigation.

Section 1012(b) of the McCarran-Ferguson Act provides as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."

Defendants contend, and this Court agrees, that the general business of automobile insurance and the particular aspect of that business at issue herein, risk classification, is "regulated by state law" in Texas.[2] Chapter Five Subchap-

---

2. This Court has previously had occasion to examine the McCarran-Ferguson Act and the meaning of "the business of insurance" in American General Insurance Co. v. F. T. C., 359 F.Supp. 887 (S.D.Tex.1973). In that case this Court, relying on SEC v. National Securities, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 65 (1969), concluded that the business of insurance as expressed in the McCarran-Ferguson Act means that business relating to the relationship between the insurance company and the policyholder but

ter A of the Texas Insurance Code charges the State Board of Insurance with the responsibility of determining risk classifications for automobile insurance policies issued in this State and determining the premiums to be charged each classification.[3] Insurance companies are prohibited by statute from adopting, without Board authorization, any risk classification plan or premium rate which deviates from the plan or rate established by the Board.[4]

Pursuant to the authority granted in Subchapter A, the State Board of Insurance adopted the Texas Driving Insurance Plan on July 27, 1966.[5] The plan establishes a classification system designed to penalize drivers with bad driving records. It requires each insurer to classify each policy to become effective after August 1, 1967 according to the number of driving record points accumulated over a specified experience period by the applicant or any operator of the vehicle currently resident in the same household. Points are assigned according to the number and seriousness of a driver's traffic offense convictions and/or his accident record.[6] Once a driver has been assigned and appropriate number of points under the plan, and his policy has been classified accordingly, the issuing company *must* charge the premium rate for the policy authorized and established by the State Board of Insurance.[7]

It is impossible to ascertain from the pleadings whether Defendants stand accused of merely following the dictates of the Plan or with somehow departing from its terms. There is language in the First Amended Complaint which seems to point in both directions.[8] Under either circumstance, however, the §

does not include the relationship involved in the merger of insurance companies. "The relationship involved in the merger of insurance companies is in essence one between individual companies and between those companies seeking to merge and the industry as a whole . . . This Court must conclude that the merger activity of insurance companies is not part of the 'business of insurance' over which state regulation is given paramount importance in McCarran, and that Section 7 of the Clayton Act which is grounded on the federal interest in maintaining competition in interstate commerce in no sense invalidates, impairs or supercedes state insurance laws which regulates the 'business of insurance,' i. e. the relationship between the insurance company and the policyholder." At 896. There can be no question that the issue of risk classification raised in the instant suit goes directly to the relationship between the insurance company and the policyholder.

3. Article 5.01 of the Texas Insurance Code, V.A.T.S. provides in part:
   "The Board shall have the sole and exclusive power and authority, and it shall be its duty to determine, fix, prescribe, and promulgate just, reasonable and adequate rates of premiums to be charged and collected by all insurers writing any form of insurance on motor vehicles in this State . . ."

4. Article 5.03 states as follows:
   "On and after the filing and effective date of such classification of such risks and rates, no such insurer shall issue or renew any such insurance at premium rates which are greater or less than, or different from, those approved by the Board . . ."

5. Official Order No. 8363.

6. See Appendix A.

7. The insurer must charge the standard premium rate set by the Board for a particular policy, plus a surcharge which is determined according to the number of points assigned under the Plan. Surcharges are calculated as follows:

| Points | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Percent | 00% | 15% | 35% | 60% | 90% |

8. The bulk of the Complaint is aimed at the practice of automatically assessing penalty points, without notice or a hearing, upon the happening of certain events, i. e. an accident. This would seem to indicate that Defendants are merely following the Plan since it clearly anticipates this type of assessment. Subdivision G of the Texas Driving Insurance Plan provides as follows:
   "Every insurer shall correctly classify and rate each policy written under this Plan and shall require the prescribed 'Texas Automobile Insurance Rating Statement,' personally signed by the applicant and the agent . . ."

   There is no provision in the Plan for any type of hearing prior to classification. An-

1012(b) exemption would remain applicable. The risk classification aspect of the business of insurance is "regulated by state law" within the meaning of the McCarran-Ferguson Act regardless of whether Defendants are reclassifying policies in accordance with the Plan or not.

If the allegation is that Defendants are violating federal antitrust laws by following the scheme promulgated by the State Board of Insurance, unquestionably their conduct is "regulated by state law." Any other conclusion would render § 1012(b) virtually meaningless. See, Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir. 1971); California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., 175 F.Supp. 857 (N.D.Cal. 1959).

Although the conclusion is not quite so obvious, the § 1012(b) exemption would remain applicable even if Defendants are charged with having acted in concert to classify policies in a manner contrary to the Texas Driving Insurance Plan. This conclusion is sustainable on two similar but analytically distinct theories. First, where a comprehensive scheme has been adopted for the purpose of regulating a particular aspect of the insurance business, courts have consistently refused to inquire into the wisdom or effectiveness of those regulations in determining the applicability of § 1012(b). Arguments that § 1012(b) does not apply in situations where state regulations are ineffective have fallen on deaf ears. Commander Leasing Co. v. Transamerica Title Ins. Co., 477 F.2d 77 (10th Cir. 1973); Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir. 1971). The Texas scheme is both comprehensive and detailed and this Court can see no reason for departing from the views expressed in the cases cited above.

Second, if Defendants have conspired to improperly classify policies and thereby increase the cost of insurance for those reclassified, they have violated the Texas antitrust laws. Tex.Bus. and Com.Code Ann. §§ 15.02 and 15.04 V.T. C.A. It has been held, with no mention of enforceability, that the existence of state antitrust laws covering the conduct alleged in a complaint can, without more, trigger the § 1012(b) exemption. Steingart v. Equitable Life Assurance Society of the United States, 1973, 366 F.Supp. 790 (S.D.N.Y., November 23, 1973); Sanborn v. Palm, 336 F.Supp. 222 (S.D.Tex.1971); California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., 175 F. Supp. 857 (N.D.Cal.1959).

In an effort to remove their antitrust allegations from the ambit of § 1012(b), Plaintiffs seek shelter in § 1013(b) of the McCarran-Ferguson Act which provides: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or imtimidation." It is Plaintiffs' theory that Defendants' conduct in refusing to issue Plaintiffs a policy except after they submitted to re-classification comes within the purview of this section.

This Court is convinced that Plaintiffs' reliance on § 1013(b) is misplaced. It cannot be disputed that the terms boycott and coercion, as commonly defined, might be construed to encompass the type of activity attributed to Defendants in the instant case. An examination of the legislative history of this section reveals, however, that Congress was seeking to regulate a rather narrow area of activity bearing no resemblance to the situation described in Plaintiffs' Complaint. Section 1013(b) was designed primarily to deal with conspiracies or combinations among insur-

---

other statement in the Complaint, however, tends to support the opposite inference:

"Such illegal and collusive acts are the acts of Defendants and in no way represent or are alleged to be the acts of the State Board of Insurance nor the product of its decision-making powers."

ance companies and agents for the purpose of boycotting or refusing to deal with other insurance companies and agents. There is nothing in the legislative history or case law bearing on this section to indicate that it is applicable to a refusal by insurance companies to deal with particular segments of the public except under fixed classifications and premium rates.[9] As stated in Transnational Ins. Co. v. Rosenlund, 261 F.Supp. 12 (D.Or.1966):

> "The legislative history shows that the boycott, coercion and intimidation exception was placed in the legislation to protect insurance agents from the issuance by insurance companies of a 'black-list,' which would name companies or agents which were beyond the *pale*. This list, in effect, was a directive to an agent not to write insurance in the name of or for the black-listed company; otherwise, he would be stripped of his agency and not permitted to write insurance for any of the members of the governing organization of insurance companies. At 26–27.

If this alleged classification-fixing conspiracy were within the purview of § 1013(b) logic would dictate that the ordinary price-fixing conspiracy be accorded similar treatment, since the classification of a policy in this State is significant only in that it determines the premium rate to be charged. Where, as here, premium rates are established by the State Board of Insurance and price-fixing conspiracies are prohibited by State antitrust laws, such a result would subvert the obvious intent of the § 1012(b) proviso to exempt the business of insurance from federal antitrust laws to the extent that such business is regulated by state law.[10]

For the foregoing reasons Plaintiffs' antitrust allegations are dismissed for want of jurisdiction and for failure to state a claim upon which relief can be granted.

## II.  CONSTITUTIONAL ISSUES

■ The problems spawned by cryptic pleading arise here just as they did with respect to the antitrust claims. Plaintiffs have clearly alleged certain constitutional deprivations in connection with the automatic assessment of penalty points without notice or a hearing. But, they do not articulate whether the Plan itself is alleged to be unconstitutional. This Court will assume, as Defendants have in their briefs, that the Texas Driving Insurance Plan is somehow under constitutional attack. Otherwise these claims could be dismissed at the outset since the Fourteenth Amendment does not, as a general proposition, proscribe private conduct of private entities.[11]

9. In support of this reading of Congressional intent it is interesting to note that virtually every reported decision applying § 1013(b), or treating that section at length, has involved the problems of "black-listed" insurance companies or agents. See Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841 (2d Cir. 1963) cert. den., 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971; Cooperativa de Seguros Multiples de Puerto Rico v. San Juan, 289 F.Supp. 983 and 294 F.Supp. 627 (D.P.R.1968); United States v. New Orleans Ins. Ex., 148 F.Supp. 915 (E.D.La.1957); United States v. Ins. Bd. of Cleveland, 144 F.Supp. 684 (N.D.Ohio 1956). Neither party has cited nor can this Court locate any decision applying § 1013(b) in the context of an alleged combination of insurance companies to boycott, coerce, or intimidate policyholders at large.

10. Perhaps in recognition of this fact in the *Commander Leasing* and *Ohio AFL–CIO* cases, *supra*, where ordinary price-fixing conspiracies were at issue, no mention was made of § 1013(b). In *Steingart, supra*, another price-fixing case, the plaintiff's effort to bring his complaint within § 1013(b) was dismissed summarily. "It is readily apparent that the above suggested course of action is being offered as a last ditch effort to revive an otherwise moribund complaint. Nowhere in the complaint is there the barest hint of any facts which would support the notion of boycott or coercion." *Steingart* at 795 of 366 F.Supp.

11. See, Tanner v. Armco Steel Corporation, 340 F.Supp. 532 (S.D.Tex.1972), and the authorities cited therein.

■ Assuming then that Plaintiffs have properly stated a constitutional claim, the question becomes whether this Court should entertain that claim or invoke the doctrine of abstention and give the State Insurance Board or the courts of this State the first opportunity to grapple with the issue. Fully recognizing that it is the duty of federal courts to enforce and protect all rights secured by the United States Constitution, and that the judge-made doctrine of abstention is to be invoked ". . . only in narrowly limited special circumstances . . .," this Court concludes that abstention would be entirely proper in the instant case. Zwickler v. Koota, 389 U. S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444, 450 (1967).

The present controversy is quite similar to that faced by the Supreme Court in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).[12] The issue in *Burford* was simply whether a federal court should entertain a suit to enjoin the enforcement of an order issued by the Texas Railroad Commission relating to the drilling of oil wells in the East Texas oil field. The Court reasoned that abstention was proper in order to avoid needless conflict with the State's administration of its domestic policy. Noting that oil and gas was a very substantial resource in Texas; that the Railroad Commission had been given broad discretion in administering this resource; and that Texas had an adequate procedure for reviewing Railroad Commission orders, the Court held as follows: "Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand." *Burford* at 334, 63 S.Ct. at 1107.

Of course, automobile liability insurance and driving safety can hardly be classified as a great natural resource, but it is an area of very legitimate and substantial state interest.[13] The State Board of Insurance stands in much the same position as the Railroad Commission. Just as the Railroad Commission regulates the oil and gas industry, the Insurance Board is charged with regulating and protecting both the public and private interests involved in the automobile liability insurance industry. As is true with respect to the Railroad Commission, the legislature has provided for both administrative and judicial review of orders issued by the State Board of Insurance. Article 5.11 of the Insurance Code provides that any policy holder ". . . shall have a right to a hearing before the Board on any grievance occasioned by the approval or disapproval by the Board of any classification . . ." It also states: "Any party aggrieved shall have the right to apply to any court of competent jurisdiction to obtain redress." If the grievance is followed to the State Supreme Court a policyholder can eventually have his constitutional claims reviewed by the Supreme Court of the United States.

Thus, under the guidance of *Burford, supra,* this Court thinks it proper to invoke the doctrine of equitable abstention in order to avoid unnecessary friction with the State of Texas over the administration of its basic automobile liability insurance policy. It would do little for Federal-State relations for this Court to examine and possibly invalidate this State's system for classifying risks before the State has been given an opportunity to do so.

Plaintiffs' constitutional claims are therefore dismissed.

A Final Judgment will be entered this date dismissing this suit in its entirety.

12 See also, Barrett v. Atlantic Richfield Co., 444 F.2d 38 (5th Cir. 1971).

13. Alabama Public Serv. Comm. v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), indicates that Burford-type abstention can be warranted in situations which do not in any sense involve natural resources.

APPENDIX A

C. *Definitions*

1. Driving Record Points.

   a. *Convictions*

   Points shall be assigned in accordance with the following for motor vehicle violations for which the applicant or any operator of the vehicle currently resident in the same household has been convicted during the experience period.

   (1) Three points shall be assigned for conviction of:

   (a) driving while under the influence of intoxicating liquor or narcotic drugs; or

   (b) failure to stop, render aid, or disclose identity when involved in an accident; or

   (c) negligent homicide, murder by driving while intoxicated or aggravated assault arising out of the operation of a motor vehicle; or

   (d) any offense punishable as a felony under the motor vehicle laws of this state.

   (2) Two points shall be assigned for conviction of:

   (a) driving while license suspended or driving without a valid driver's or operator's license in force and effect; or

   (b) any other moving traffic violation as a result of which an operator's license was suspended or revoked.

   (3) One point shall be assigned under either (a) or (b) (whichever produces the highest number) for conviction of each speeding violation, per operator

   (a) beginning with the second such conviction within the latest twelve (12) consecutive months; or

   (b) beginning with the third such conviction within the latest thirty-six (36) consecutive months.

b. *Accidents*

One point shall be assigned for each automobile accident involving the applicant, or any operator of the automobile currently resident in the same household, while operating any private passenger type automobile, resulting in damage to any property, including his own, in excess of $50.00, or in bodily injury or death.

*Exceptions*—No points shall be assigned for accidents under the following circumstances:

(a) Medical Payments: accidents involving medical payments coverage only; or

(b) Legally Parked, Standing or Stopped: a motor vehicle of the applicant or any operator of the automobile currently resident in the same household damaged while legally parked, standing or stopped; or

(c) Unattended Automobile: accidents involving an automobile of the applicant or any operator of the automobile currently resident in the same household while such automobile is unattended; or

(d) Reimbursement: applicant or any operator of the automobile currently resident in the same household, or owner of the automobile driven by applicant or any operator of the automobile currently resident in the same household, reimbursed by or on behalf of the person responsible for the accident has judgment against such person; or upon applicant's showing that judgment was not sought for the reason that such person failed to prove financial responsibility under the Texas Motor Vehicle Safety-Responsibility Act; or

(e) Governmental immunity: accidents involving government-owned property or vehicles when govern-

mental immunity solely prevents recovery from the government; or

(f) Rear-end Collision: automobile driven by applicant or any operator of the automobile currently resident in the same household struck (sic) in rear by another vehicle approaching from the rear, and the applicant or any operator of the automobile currently resident in the same household was not convicted of a moving traffic violation in connection with the accident; or

(g) Other Party Charged: operator of any other automobile involved in the accident charged with a moving traffic violation and the applicant or any operator of the automobile currently resident in the same household not convicted of a moving traffic violation in connection therewith; or

(h) Hit-and-Run: automobile operated by applicant or any operator currently resident in the same household damaged by "hit-and-run" driver, if applicant or other resident operator reports the accident to proper authority within 24 hours; or

(i) Animals or Fowls: accidents involving damage by contact with animals or fowls; or

(j) Flying Gravel and Falling Missiles: accidents involving physical damage, limited to and caused by flying gravel, missiles or falling objects; or

(k) Accidents on Premises: accidents on premises owned, rented or leased by applicant or any operator of the automobile currently resident in the same household; or

(l) No Fault: accidents in which the applicant or operator was not at fault (if not charged with a violation, it will be presumed that the applicant or operator was not at fault).