414 F.Supp. 698 (1976)
Lester SEASONGOOD, Plaintiff,
v.
K & K INSURANCE AGENCY, an Indiana Corporation et al., Defendants.
No. 75-648 C (1).
United States District Court, E. D. Missouri, E. D.
February 10, 1976.
As Amended September 2, 1976.
*699 Jim J. Shoemake, Edward G. Farmer, Jr., Guilfoil, Symington & Petzall, St. Louis, Mo., for plaintiff.
Richard M. Stout, Kirkwood, Mo., William I. Rutherford, William E. Buckley, Lashly, Caruthers, Thies, Rava & Hamel, Veryl L. Riddle, John J. Hennelly, Jr., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendants.

MEMORANDUM
MEREDITH, Chief Judge.
This action is before the Court on the motions of the several defendants to dismiss or, in the alternative, for a more definite statement. For the reasons stated below, the motions to dismiss shall be granted.
Plaintiff, an insurance agent and broker, had for a period of eighteen years provided a master plan of insurance for defendant Sports Car Club of America (SCCA), a corporation organized to promote and sanction sports car races and other events. SCCA membership consists of almost one hundred regional clubs, each a separate corporation, which sponsor various sports car events under the SCCA sanction. One requirement for an SCCA sanction is the purchase of insurance coverage approved by the SCCA. Prior to February of 1975 plaintiff, under the master plan he had developed with SCCA, provided ninety-nine per cent of the coverage for the local affiliates. In February of 1975, the SCCA switched its master plan coverage from plaintiff to defendant K & K Insurance Agency (K & K), which placed the insurance with defendant Foremost Insurance Company (Foremost).
Plaintiff brings this treble damages action under section 4 of the Clayton Act, 15 U.S.C. § 15, alleging in Counts I and II that defendants, in combination with other "nondefendant co-conspirators," presumably the SCCA's local affiliates, have boycotted, coerced, and intimidated plaintiff in restraint of trade in violation of section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, and have monopolized, attempted to monopolize, and combined and conspired to monopolize the business of insuring sports car events sanctioned by SCCA in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Count III of plaintiff's complaint is based on sections 375.930, et seq., R.S.Mo.1969, which prohibit unfair practices in the insurance industry, and specifically on section 375.936(1), which prohibits acts of boycott, coercion, and intimidation.
Plaintiff alleges that defendants, with the purpose and intent of boycotting plaintiff and monopolizing the business of insuring SCCA sanctioned sports car events, concertedly engaged in the following wrongful acts: (1) K & K and Foremost by "representations" induced SCCA to switch its *700 master plan coverage to them and give them an exclusive contract for the writing of approved policies; (2) SCCA for reasons "not based on its independent business judgment" wrongfully terminated its approval of the policies written by plaintiff and gave K & K and Foremost an exclusive contract; and (3) SCCA coerced its local affiliates into refusing to deal with plaintiff by threatening to withhold the SCCA sanction unless the local clubs purchased their insurance solely through the K & K master plan.
Each of the defendants has filed a motion to dismiss Counts I and II on the grounds, among others, that the challenged practices are exempted from the federal antitrust laws by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, and to dismiss Count III on the grounds that sections 375.930, et seq., R.S.Mo. do not provide for a private right of action.
The McCarran-Ferguson Act, which exempts the business of insurance from federal antitrust laws to the extent that the state involved has enacted similar legislation and so long as the act complained of is not one of boycott, coercion, or intimidation, reads in pertinent part:
"Section 1012 . . . (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That . . the Sherman Act, . . . the Clayton Act, and . . . the Federal Trade Commission Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law."
"Section 1013 . . . (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."
Plaintiff contends that defendants' actions are not sheltered by the McCarran-Ferguson Act antitrust exclusion because the activities complained of are not the "business of insurance" within the meaning of section 1012(b), and that the practices fall within the section 1013(b) exception for boycott, coercion, or intimidation.
The Supreme Court in S.E.C. v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), set forth the standard to be used in determining whether a challenged practice is the "business of insurance" within the meaning of section 1012(b). Finding that Congress in enacting the McCarran-Ferguson Act "was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies," the Court stated:
"The statute did not purport to make the States supreme in regulating all the activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws `regulating the business of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the `business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what South-Eastern Underwriters was all about. The selling and advertising of policies, FTC v. National Casualty Co., 357 U.S. 560 [78 S.Ct. 1260, 2 L.Ed.2d 1540] (1958), and the licensing of companies and their agents, cf. Robertson v. California, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366] (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not `commerce.' The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcementthese were the core of the `business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same *701 class. But whatever the exact scope of the statutory term, it is clear where the focus wasit was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the `business of insurance.'" 393 U.S. at 459-460, 89 S.Ct. at 568-569.
Defendants K & K and Foremost, by convincing defendant SCCA to switch its master plan coverage from plaintiff to them and devising a new master plan of coverage for the association and its affiliates are clearly engaged in the business of insurance. F.T.C. v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), (F.T.C. cease and desist order prohibiting insurance companies from engaging in certain advertising practices found to be false, misleading, and deceptive set aside on the ground that the Commission lacked jurisdiction because of the McCarran-Ferguson Act). The alleged tying of the granting of the SCCA sanction to the purchase of insurance through the K & K master plan is directly parallel to the situation in two recently decided cases where insurance-lenders tied the granting of mortgage loans to the purchase of insurance policies. Dexter v. The Equitable Life Assurance Society of the U. S., 527 F.2d 233, 1975-2 Trade Cases ¶ 60,601 (2d Cir. Nov. 18, 1975); Addrisi v. Equitable Life Assurance Society of the U. S., 503 F.2d 725 (9th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975). As the Court stated in Dexter, "An insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship, and thus constitute an integral part of `the business of insurance.'" 527 F.2d at 235, 1975-2 Trade Cases at 67,655. Accord, Holly Springs Funeral Home v. United Funeral Service, Inc., 303 F.Supp. 128 (N.D.Miss.1969).
Plaintiff argues that the business of insurance, as defined in S.E.C. v. National Securities, supra, relates strictly to the insurance company-policyholder relationship, and that the interposition of a non-insurance entity, SCCA, between the insurance company and the policyholders, the local affiliates, somehow removes the practice from the boundaries of the business of insurance. The few cases where the activities of insurance companies have not found shelter under the Act, other than those cases which primarily involved the insurance company's relationship with its stockholders, e. g., S.E.C. v. National Securities, supra (merger of two insurance companies); United States v. Meade, 179 F.Supp. 868 (S.D.Ind.1960) (sale of stock of insurance company), have involved a combination of an insurance company with a non-insurance entity, not to sell insurance as here, but to procure non-insurance business for the non-insurance company. In Battle v. Liberty National Life Ins. Co., 493 F.2d 39 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), a burial insurance company which had a wholly-owned subsidiary in the business of supplying the servicing funeral homes, required the funeral homes, in order to become "authorized" for servicing the insurance company's policyholders, to contract with the insurance company's subsidiary for caskets and other merchandise and services, and to maintain certain standards established by the subsidiary. Significantly fewer benefits were available to a policyholder using a non-authorized home. The Court found that the insurance company in its arrangement with the homes, by including a non-insurance intermediary, had gone beyond the business of insurance into the funeral services business. The Court in Hill v. National Auto Glass Co., Inc., 1971 Trade Cases, ¶ 73,594, at 90,459 (N.D.Calif., June 1, 1971), finding that "Congress at no time indicated an intent to give insurance companies carte blanche to operate in concert with non-insurance companies," held that an automobile insurance company's exclusive arrangement with a glass company on behalf of its policyholders and claimants to allocate business, fix prices, and boycott other glass setters was not the business of insurance. In both Battle and Hill, the impact of the challenged practice on the policyholder-insurance company relationship was so attenuated *702 as to be insignificant compared to its effect on the non-insurance entities.
Where the challenged practices have had an impact on the insurance company-policyholder relationship directly or indirectly through their effect on rates, even though the practice involved other parties, the practices have been held the business of insurance. In Travelers Insurance Co. v. Blue Cross, 481 F.2d 80 (3d Cir.), cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973), the section 1012(b) exemption was applied to a favorable reimbursement contract between Blue Cross and several hospitals providing medical services to policyholders. An important factor in the Court's decision was the direct and substantial impact of the contractual arrangement on the insurance company's ratemaking structure. 481 F.2d at 83. Similarly, in California League of Independent Ins. Producers v. Aetna Casualty and Surety Co., 175 F.Supp. 857, 860 (N.D.Calif.1959), involving insurance company contracts with their agents, a combination fixing the agents' commissions was exempted because the size of the commissions was a "vital factor in the ratemaking structure." See Miley v. John Hancock Mutual Life Ins. Co., 148 F.Supp. 299 (D.Mass.1957), aff'd, 242 F.2d 758 (1st Cir. 1957) (per curiam), where an alleged conspiracy among several Massachusetts insurance companies and members of the state employees' group insurance commission to deprive plaintiff Minnesota insurance company of a contract for the employee group insurance plan failed to state a claim under the Sherman Antitrust Act.
Plaintiff does not dispute defendants' argument that the state regulation of the insurance industry necessary to trigger the section 1012(b) exemption is present, see Lawyers Title Co. of Missouri v. St. Paul Title Ins. Corp., 526 F.2d 795 (8th Cir. 1975); Ohio AFL-CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972), and, in fact, bases the third count of his complaint on the Missouri insurance code. Rather, he argues that even if the challenged practices are found to be the business of insurance, they fall within the section 1013(b) exception for acts of boycott, coercion, or intimidation. Plaintiff argues that defendants have combined to coerce the SCCA's local affiliates, through the alleged exclusive contract and tying arrangement to boycott plaintiff. An examination of the legislative history of section 1013(b), and the several cases applying that section, convinces this Court that the boycott exception was designed to cover only the narrow area of restraints of trade practiced by insurance companies and agents for the purpose of boycotting, intimidating, or coercing other insurance companies and agents. As stated by the Court in Transnational Ins. Co. v. Rosenlund, 261 F.Supp. 12, 26-27 (D.Or.1966):
"The legislative history shows that the boycott, coercion and intimidation exception, was placed in the legislation to protect insurance agents from the issuance by insurance companies of a `black-list,' which would name companies or agents which were beyond the pale. This list, in effect, was a directive to an agent not to write insurance in the name of or for the black-listed company; otherwise, he would be stripped of his agency and not permitted to write insurance for any of the members of the governing organization of insurance companies."
Section 1013(b) does not apply ". . . in the context of an alleged combination of insurance companies to boycott, coerce, or intimidate policyholders at large." Meicler v. Aetna Casualty and Surety Co., 372 F.Supp. 509 (S.D.Texas 1974), aff'd, 506 F.2d 732 (5th Cir. 1975).
As noted above, the facts of this action are directly parallel to those in Addrisi v. The Equitable Life Assurance Society of the U. S., supra, where the alleged coercion of policyholders, by use of a tying arrangement, to do business solely with the defendant insurance company was held not to be a boycott within the meaning of section 1013(b).
Plaintiff in Count III attempts to assert a claim under the Unfair Practices and *703 Frauds Act, part of the Missouri insurance code, sections 375.930, et seq., R.S.Mo.1969. The Act provides a detailed system of administrative regulation whereby the Superintendent of Insurance is empowered to investigate possible violations of the Act, hold hearings on charged violations, and issue cease and desist orders to enforce the Act. Penalties for violations of the cease and desist orders and the procedure for judicial review of the orders are provided.
Nowhere in the Act is there a provision for a private action whereby an aggrieved person could enforce the Act, and plaintiff concedes that no private cases have been brought under the Act. There is a clear line of Missouri cases which holds that a statute which creates a criminal offense and provides a penalty for its violation will not be construed as creating a new civil cause of action independent of common law, unless such appears by clear implication to have been the legislative intent. Parker v. Lowery, 446 S.W.2d 593 (Mo. 1969); Giloti v. Hamm-Singer Corp., 396 S.W.2d 711 (Mo.1965); Aluma Kraft Mfg. Co. v. Elmer Fox & Co., 493 S.W.2d 378 (Mo.App.1973). Although the above cases involve criminal statutes, the principle they express is clearly analogous to the penal statute at issue here. Since nothing in the Act itself or its legislative history suggests the creation of a private right of action, see Historical Note to section 375.930, Count III does not state a claim under Missouri law. Compare Retail Clerks Welfare Fund v. Continental Casualty Co., 71 N.J.Super. 221, 176 A.2d 524 (1961), with Greenberg v. Equitable Life Assurance Society of the U. S., 34 Cal.App.3d 994, 110 Cal.Rptr. 470 (1973).
Plaintiff argues that the last section of the Act "seems to add additional remedies." Section 375.948 reads:
"Powers of superintendent in addition to others.The powers vested in the superintendent of insurance by sections 375.930 to 375.948 shall be additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts and practices hereby declared to be unfair or deceptive. (L.1959 H.B. 251 § 10)"
Plaintiff contends that the "other powers" referred to in section 375.948 refer to the state antitrust laws, Chapter 416, R.S.Mo. 1949, as amended, (Supp.1974), which does provide a private remedy, in section 416.121. This Court can find no basis for plaintiff's reading of section 375.948, especially in view of section 416.041, which provides that
"2. Nothing contained in the Missouri antitrust law shall be construed to apply to activities or arrangements expressly approved or regulated by any regulatory body or officer acting under statutory authority of this state or of the United States."